## C. F. Eblin, Administrator, Appellee, v. American Car and Foundry Company, Appellant.

INSTRUCTIONS—*form of upon assumed risk approved.* An instruction upon this subject as follows is approved:

"The court instructs the jury that the servant only assumes the usual and ordinary risks incident to the business, and such risks as are known to him or which might have been discovered by him by the exercise of ordinary care. But the servant does not assume extraordinary or unusual risks, nor risks due to the master's own negligence unless the servant had notice of such perils, or by the exercise of ordinary care should have had notice thereof."

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Madison county; the Hon. B. R. BURROUGHS, Judge, presiding. Heard in this court at the February term, 1908. Affirmed. Opinion filed September 12, 1908.

WISE & McNULTY, for appellant.

J. M. BANDY and D. J. SULLIVAN, for appellee.

MR. JUSTICE CREIGHTON delivered the opinion of the court.

This was an action in case, in the Circuit Court of Madison county, by appellee against appellant, to recover damages sustained to the next of kin by reason of the death of appellee's intestate, alleged to have been caused by negligence on the part of appellant while intestate was in the service of appellant as a car finisher, on one of its "shipping tracks." Trial by jury. Verdict and judgment in favor of appellee for $1,900.

Counsel for appellant insist that the judgment in this case should be reversed and not remanded, on the ground that the intestate was killed as a result of his own negligence, and on the further ground, that if there was negligence other than his own which contributed to his injury and death, it was negligence of fellow-servants for which appellant was not liable. They also insist as grounds for reversal, that the trial court admitted improper evidence on behalf of appel-

lee and rejected proper evidence offered on behalf of appellant, that the court gave to the jury an improper instruction at appellee's request, and that the verdict is against the weight of the evidence.

Appellant was operating an extensive plant for the manufacture of railroad cars, at Madison, Illinois. In connection with its business it maintained shops, and a large yard adjacent thereto, equipped with numerous railroad tracks. The shop men constructed the cars in the shop. When they had done their work upon them the cars were then run out of the shop and placed on certain tracks in the yard, to be completed by the "finishers." The tracks set apart for this work were two tracks, from a quarter to a half mile in length, designated "tracks No. 5 and No. 6." They were also called the "shipping tracks." After the cars were placed on these tracks, each one had to be gone over carefully. "The nuts, screws, bolts and everything in the car were put on there and the entire work examined and overhauled so as to see that the car was in perfect order." While doing this work the men were required to be under and between the cars. There were about 125 men engaged in this department of the business, among them appellee's intestate. These men were in charge of a foreman and three assistant foremen.

In carrying forward its business appellant maintained locomotive engines and switching crews whose duty it was to haul material to and from the shops, in and out of the yards, move cars from place to place in the yards, and when new cars were fully completed, inspected and received, to take them from these finishing or shipping tracks and deliver them to the Terminal Railroad Association. These switching crews were under the direction of a yard master.

"The custom was, when a switching crew received notice to remove cars from these finishing tracks during working hours, that is when men were working on the cars, the engine would back in to the first or end

car and the switchmen would then go along the track and inform all persons under the cars that the cars were going to be switched and to get out and take out their tools from under them"—"would pass down along the string of cars upon that track and continually call out in a loud voice: 'All out on track No. ———,' giving the number of the track upon which the engine was about to run.''

The injury to intestate occurred on a Saturday, and on Saturdays the men were given but half an hour off for dinner, from 12 o'clock to 12:30. The whistle would blow at 12, and the men would leave their work and go to eat their dinner. At 12:20 the whistle would blow to notify the men that they must be at their places with their tools ready to go to work again in ten minutes, and at 12:30, it would again blow for them to commence work.

On the occasion of intestate's injury he had been working under a car on track No. 5. When the whistle blew for noon, he and his father took their lunch and went inside an enclosure near by and there ate together. After the 12:20 whistle blew intestate left his father and went to his working place, and about one or two minutes before 12:30, he went under the car with his hammer and chisel, to his place at the forward truck and took position astride one of the rails, ready to strike when the whistle should blow; and a number of the other men were also in place under that car and under other cars in the same string, when suddenly, without any notice or warning the switching crew threw a cut of cars in upon that track instantly killing the intestate and one other man, and injuring many. It is not claimed that the usual custom with respect to notice was complied with on that occasion, nor that any notice of any kind was given at the time.

Appellant's position with respect to this feature of the case is, that on the day of the injury at about half after eleven o'clock in the forenoon, the foreman and the three assistant foremen went down the track and

notified the men "that the cars on track No. 5, were to be moved during the noon hour," and that they specially remember speaking to the intestate and "telling him to take his tools from under the cars, that they were going to make a switch during dinner time." The foreman and all the assistant foremen testified to this state of facts. Many witnesses who were under cars on this track and others who were working along track No. 6, but a few feet away, testify that they did not hear any such notice.

As we view the case, it is not very important whether this notice was in fact given or not. Assuming that the intestate did receive such notice, he could not have understood that the "noon hour" or "dinner time" included the ten minutes between the sounding of the second and third whistles, and especially, the last minute or two of that time. It was the duty of the men upon hearing the second whistle to go to their respective places of work and to be ready to go to work by the time the third whistle should sound. And further, the evidence shows that the practice was, when switching was done during the "noon time," it was done before the sounding of the second whistle, and not during the ten minutes in which the men were required to go to their places and get themselves and their tools ready to commence work; and this was a safe and sane practice.

With respect to the purpose of sounding the second whistle, counsel argue that the only purpose of it was to notify the shop men to oil their machinery, and the engineer to start the engine, so that all would be in readiness to start when the third whistle should blow. This position is not sustained by the evidence. The men who worked in the yard did not so understand. In fact in counsel's statement of the case they say: "The men who are working about the place know that this whistle is ten minutes before they go to work, and generally consider this a notice to them to get ready so they can go to work when the last whistle

blows." The foreman of these 125 car finishers, who worked on the shipping tracks, testified: This "whistle is blown so as to give the men ten minutes notice to get ready. The men might be inside the plant who are working on the shipping tracks when the last whistle would be blown, and they wouldn't be at their work in time and for that reason that whistle is blown. When the last whistle is blown he is expected to go to work."

The rulings complained of as to the admission and rejection of evidence, were made with respect to the testimony of witnesses concerning the alleged notice given to intestate by the foreman and his assistants, on the forenoon of the day of the injury. As appears from what we have said above, we do not consider this feature of the case of sufficient importance to call for discussion; we do not, however, find any material error in the rulings of the court complained of.

The instruction complained of is as follows:

"The court instructs the jury that the servant only assumes the usual and ordinary risks incident to the business, and such risks as are known to him or which might have been discovered by him by the exercise of ordinary care. But the servant does not assume extraordinary or unusual risks, nor risks due to the master's own negligence unless the servant had notice of such perils, or by the exercise of ordinary care should have had notice thereof."

And counsel say: "The Supreme Court in Kath v. East St. Louis Suburban Ry. Co., 232 Ill. on page 133, condemn such an instruction, for the reason that the jury are informed that the deceased did not assume risks due to the master's negligence." The instruction here complained of contains a clause not appearing in the condemned instruction in the same connection that it appears in the one under consideration here. The clause is, "unless the servant had notice of such perils, or by the exercise of ordinary care should have had notice thereof." This clause, in the connection that it is used in the instruction in this case, cures the vice

for which the instruction in the case cited was condemned. It will be observed that in this case the clause above quoted follows and qualifies the statement that the servant does not assume ''risks due to the master's negligence,'' while in the condemned instruction that part of it was wholly unqualified, and it was condemned on that ground alone.

There is, in our opinion, no warrant in this record for the contention that ''the intestate was killed as a result of his own negligence.'' And in our judgment the question of fellow-servant is not involved in the case. The duty that rested upon appellant was one that could not be delegated.

We regard this case as wholly meritorious and free from substantial error, and we think the judgment of the Circuit Court should be affirmed.

The judgment of the Circuit Court is affirmed.

*Affirmed.*